FILED IN OPEN COURT
U.S.D.C. - Atlanta

OCT 2 4 2025

KEVIN P. WEIMER, Clerk
By: ᒍᕼᑎ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

*v.*

LEONARD MEDLEY

Criminal Information

No. 1:25-cr-452

THE UNITED STATES ATTORNEY CHARGES THAT:

## Count One
## Conspiracy to Commit Wire Fraud
## 18 U.S.C. § 371

1. Beginning at least by in or about January 2022, and continuing until at least in or about February 2023, in the Northern District of Georgia and elsewhere, the defendant, **LEONARD MEDLEY**, did knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with others known and unknown to the United States, to commit an offense against the laws of United States, that is: to devise and intend to devise a scheme and artifice to defraud lenders, and to obtain money and property from these lenders by means of materially false and fraudulent pretenses, representations, and promises, and by the omission of material facts, and for the purpose of executing this scheme, to cause wire communications to be transmitted in interstate commerce, in violation of Title 18, United States Code, Section 1343.

## Background

At all times relevant to this Information:

1. Defendant **LEONARD MEDLEY** was a closing attorney based in Atlanta, Georgia.

2. Debra Bryant was a licensed real estate agent in the Northern District of Georgia through the real estate brokerage firm JP & Associates Realtors.

3. Debra Farrell operated a financial company that facilitated obtaining "hard money loans" for borrowers seeking to buy and flip residential properties, to purchase rental properties, and for new construction. Hard money loans are high-interest loans secured by real property. They are primarily used in real estate transactions.

4. Individual-1 was a commercial real estate developer primarily in the Atlanta metro area.

5. Individual-2 resided outside of the United States and created false and fraudulent documents, including fraudulent bank statements.

6. Alvarez Investment Group LLC ("Alvarez") was a Georgia limited liability company with a principal place of business in Conyers, Georgia. According to Georgia Secretary of State records, J.B. was Alvarez's purported organizer and registered agent. In actuality, Individual-1 owned and operated Alvarez.

7. 2 Big Legacy LLC ("2 Big Legacy") was a Georgia limited liability company with a principal place of business in Lithonia, Georgia. C.F. was

the purported CEO and managing member of 2 Big Legacy. In actuality, Individual-1 owned and operated 2 Big Legacy.

8. 2 Big Holdings LLC ("2 Big Holdings") was a Georgia limited liability company with a principal place of business in Lithonia, Georgia. C.F. was the purported sole member of 2 Big Holdings. In actuality, Individual-1 owned and operated 2 Big Holdings.

9. The "MLK Property" was a residential apartment complex located on Martin Luther King Jr. Drive in southwest Atlanta, consisting of approximately 100 garden townhome-style apartments.

10. Lender-1 was a private money lender headquartered in Oregon who financed 2 Big Legacy's purchase of the MLK Property from Alvarez in or about June 2022.

11. Lender-2 was a private money lender who financed Alvarez's purchase of the MLK Property in or about November 2020.

12. The "Brittany Place Property" was a 36-building apartment complex located in Decatur, Georgia, with each building consisting of six one- or two-bedroom units.

13. Maple Key, LLC ("Maple Key") was a Georgia limited liability company with a principal place of business in Roswell, Georgia. Maple Key was the owner of the Brittany Place Property.

3

14. Spry Holdings, LLC ("Spry Holdings") was a Georgia limited liability company with a principal place of business in Alpharetta, Georgia. C.S. was the sole member of Spry Holdings.

15. Brittany Place 2022, LLC ("BP 2022") was a Georgia limited liability company with a principal place of business in Atlanta, Georgia. C.S. was the sole member of BP 2022. In actuality, Individual-1 owned and operated BP 2022.

16. Lender-3 was a private money lender headquartered in California who financed 2 Big Legacy's purchase of two buildings within the Brittany Place Property in or about February 2022.

17. Lender-4 was a private money lender headquartered in the State of Washington who financed 2 Big Legacy's purchase of seven buildings within the Brittany Place Property between in or about February and March 2022.

18. Lender-5 was a private money lender headquartered in California who financed 2 Big Legacy's purchase of six buildings within the Brittany Place Property in or about May 2022.

19. Lender-6 was a private money lender headquartered in North Carolina who financed Spry Holdings' purchase of seven buildings within the Brittany Place Property in or about July 2022.

4

**Manner and Means**

20. Beginning no later than in or about January 2022 and continuing until at least in or about August 2022, defendant **MEDLEY**, Farrell, Bryant, Individual-1, Individual-2, and others executed a scheme to fraudulently obtain hard money loans for the purported sale and purchase of various residential and commercial properties, including the sale of MLK Property from Alvarez to 2 Big Legacy involving Lender-1 ("Transaction-1"), the purported sale of multiple units within the Brittany Place Property from Maple Key to 2 Big Legacy in a series of separate transactions involving Lender-3, Lender-4, and Lender-5 (collectively "Transaction-2"), and the sale of buildings within the Brittany Place Property from Maple Key to Spry Holdings involving Lender-6 (collectively "Transaction-3").

21. To obtain hard money loans from various institutions, including Lender-1 for the MLK Property and Lender-3, Lender-4, Lender-5, and Lender-6 for the transactions involving the Brittany Place Property, defendant **MEDLEY**, and others, submitted and caused to be submitted false and fraudulent loan applications that included multiple material misrepresentations, including about the identity of the actual borrower and fabricated bank statements. If Lender-1, for example, had known that the Transaction-1 was not arm's length, *i.e.*, that the borrower/buyer and seller were on both sides of the transaction, that the borrower, C.F., was a straw purchaser, that the conspirators had submitted fabricated bank

5

statements, and that the loan proceeds were not used for the intended purpose of financing the Transaction, Lender-1 would not have approved the loan.

22. Likewise, with respect to Transaction-2, if Lender-3, Lender-4, and Lender-5 had known, among other things, that the borrower, C.F., was a straw purchaser, the conspirators had submitted fabricated bank statements, defendant **MEDLEY** had prepared false and fraudulent settlement statements, 2 Big Legacy never made the stated contributions, and the loan proceeds were not used for the intended purpose of financing Transaction-2, Lender-3, Lender-4, and Lender-5 would not have approved the loans.

23. Similarly, with respect to Transaction-3, if Lender-6 had known that the borrower, C.S., was a straw purchaser, the conspirators had submitted fabricated bank statements, and defendant **MEDLEY** had prepared false and fraudulent settlement statements, Lender-6 would not have approved the loans.

<u>MLK Property – Transaction-1</u>

24. Bryant was the listing agent for the MLK Property. On or about March 11, 2022, J.B., on behalf of Alvarez, executed an exclusive seller brokerage agreement with Bryant. The brokerage agreement stated that the MLK Property was being listed for $17,000,000. Under the terms of the

brokerage agreement, Bryant was entitled to a commission equal to 1% of the sales price.

25. Beginning in or about February 2022, Individual-1 directed Farrell to work with brokers to identify potential lenders to finance the Transaction.

26. Farrell corresponded with other brokers in her network to obtain financing for Individual-1 to purchase the MLK Property through 2 Big Legacy. Through Farrell's network, she identified Lender-1 as a potential source of financing. In or about March 2022, an application for financing was submitted to Lender-1 with C.F. listed as the owner of 2 Big Legacy.

27. As part of the lending process, Lender-1 required bank statements from the borrower, 2 Big Legacy, and its purported owner, C.F. On or about February 3, 2022, Farrell provided C.F.'s actual bank statements for C.F.'s business to Individual-1 and Bryant, including a December 2021 bank statement for C.F.'s business account at JPMorgan Chase account x3536 ("Chase x3536"). As of December 31, 2021, C.F.'s Chase x3536 account showed an ending balance of $623.25. Throughout the lending process, Farrell requested that Individual-1 and Bryant provide specific bank statements for C.F.'s business account, 2 Big Legacy, and 2 Big Holdings. Individual-1, not C.F., was the lone signatory for the bank accounts in the names of 2 Big Legacy and 2 Big Holdings.

7

28. Bryant found Individual-2 on Fiverr, a freelance services marketplace, who was willing to prepare fraudulent bank statements. Bryant thereafter emailed Individual-2 a copy of C.F.'s actual Chase x3536 December 2021 bank statement, from which Individual-2 generated fake bank statements for Chase x3536 account for December 2021, January 2022, February 2022, March 2022, April 2022, and May 2022, fraudulently showing ending balances of $6,000,623,.25, $6,002,595.14, $8,000,638.25, $8,001,610.14, $8,005,701.98, and $8,006,638.25, respectively. In reality, the balance in Chase x3536 account for each month was, respectively, $623.25, $11,978.52, $3,457.34, $325.84, $506.10, and $200.16. Bryant paid Individual-2 to make these fraudulent bank statements via Western Union.

29. On multiple occasions, between approximately February 2022 and May 2022, Farrell requested from Bryant (and in some cases Individual-1 and Bryant) bank statements for 2 Big Legacy and 2 Big Holdings. Bryant provided fake and fraudulent bank statements for both entities. For example, on or about March 3, 2022, Bryant emailed Farrell (copying Individual-1) purported December 2021 and January 2022 bank statements for 2 Big Holdings' Bank of America account x5037 ("BOA x5037"), showing ending balances over $6.8 million for each month. In actuality, the BOA x5037 account was closed in or about October 2021. Similarly, on or about April 11, 2022, Farrell requested from Individual-1 and Bryant a

8

copy of the March 2022 bank statement for 2 Big Legacy's Bank of America account x4804 ("BOA x4804"). In response, Bryant emailed Individual-1 a fraudulent March 2022 statement for the BOA x4804 account showing a balance of $3,070,311.92, when the actual balance was $523,934.85. On or about April 12, 2022, Individual-1 forwarded to Farrell the fraudulent March 2022 BOA x4804 statement he had received from Bryant.

30. During the lending process, Farrell electronically submitted and caused to be electronically submitted to Lender-1 the false and fraudulent bank statements for the Chase x3536, BOAx5037, and BOA x4804 accounts for the purpose of misleading Lender-1 into believing that the purported borrower, C.F., had millions in liquid assets. Defendant **MEDLEY**, Individual-1, Farrell, and Bryant knew these bank statements were false and fraudulent when they were ultimately submitted to Lender-1.

31. Defendant **MEDLEY** was responsible for preparing the certified settlement statement for Transaction-1. The settlement statement was intended to provide a true and accurate breakdown of the financial aspects related to the Transaction-1, including disclosing the following information: the sale price, loans charges, any loan payoffs, title charges, recording fees, and other miscellaneous charges.

32. In preparation for the closing on the MLK Property and prior to defendant **MEDLEY** releasing any loan proceeds from Lender-1,

9

defendant **MEDLEY** was required to follow Lender-1's closing instructions, which included preparing a certified settlement statement for the Transaction. Defendant **MEDLEY** initialed after each of the Lender-1's closing instructions acknowledging he followed the instruction. Defendant **MEDLEY** prepared and later submitted the certified settlement statement to Lender-1 for the Transaction knowing it contained false information.

33. For example, Lender-1's closing instructions directed defendant **MEDLEY** to confirm all liens, encumbrances, and mortgages on the MLK Property were either cleared prior to closing or paid through the closing of the escrow. Defendant **MEDLEY** knew that Alvarez owed over approximately $9 million to Lender-2 from when Alvarez purchased the property in November 2020 because defendant **MEDLEY** was also the closing attorney for that transaction. Defendant **MEDLEY** failed to disclose the outstanding loan to Lender-2 on the settlement statement.

34. Lender-1's closing instructions also required defendant **MEDLEY** to provide a certified copy of the settlement statement disclosing how the loan proceeds were disbursed at the Transaction's closing. Defendant **MEDLEY** falsely represented in the certified settlement statement that the buyer, 2 Big Legacy, had transferred approximately $5.9 million to defendant **MEDLEY** toward the purchase price, and defendant **MEDLEY** had paid approximately $16.9 million to the seller, Alvarez, at closing. In

10

actuality, defendant **MEDLEY** knew that he neither received $5.9 million from 2 Big Legacy nor paid $16.9 million to Alvarez at the closing.

35. Defendant **MEDLEY** was further aware, but did not disclose to Lender-1, that the sale of the MLK Property from Alvarez to 2 Big Legacy was not an arm's length transaction because Individual-1 was on both sides of the transaction.

36. On or about June 1, 2022, Lender-1 caused an electronic wire transfer of $11,900,000 to be transmitted to defendant **MEDLEY's** account.

37. The funds received by defendant **MEDLEY** from Lender-1 were not used in the manner set out in the certified settlement statement prepared by defendant **MEDLEY**. Instead of paying Alvarez $16.9 million in proceeds as the seller of the MLK Property, a substantial portion of the funds were used to pay Lender-2. On or about July 1, 2022, defendant **MEDLEY** wired $10,324,876.79 to Lender-2. Lender-1 would not have disbursed the loan proceeds to defendant **MEDLEY** if it knew the certified settlement statement contained false information.

38. After the closing, on or about June 9, 2022, Farrell received $118,955 for her role in the transaction.

39. After the closing, on or about June 15, 2022, Bryant received $135,250 for her role in the transaction.

11

40. After not receiving the first scheduled loan payment from 2 Big Legacy in August 2022, Lender-1 began foreclosure proceedings on the MLK Property, and ultimately took possession of the property.

#### Brittany Place Property – Transaction-2

41. Beginning no later than in or about January 2022, Individual-1 directed Farrell to work with brokers to identify potential lenders to finance Transaction-2.

42. Farrell corresponded with other brokers in her network to obtain financing for Individual-1 to purchase multiple units within the Brittany Place Property through 2 Big Legacy. Through Farrell's network, she identified Lender-3, Lender-4, and Lender-5 as potential sources of financing.

43. As part of the lending process, Lender-3, Lender-4, and Lender-5 required bank statements from the borrower, 2 Big Legacy, and in some instances, bank statements for 2 Big Legacy's purported owner, C.F.

44. For example, on or about February 7, 2022, Farrell emailed Bryant and Individual-1 and requested a copy of 2 Big Legacy's January 2022 Bank of America bank statement. On or about February 8, 2022, Bryant emailed Individual-1 and Farrell a purported copy of 2 Big Legacy's January 2022 bank statement showing an ending balance of $3,065,178.63,

12

when in actuality the ending balance in 2 Big Legacy's account in January
2022 was $685,739.90.

45. During the lending process, Farrell electronically submitted and
caused to be electronically submitted to Lender-3 and Lender-4 the false
and fraudulent January 2022 Bank of America statement for 2 Big Legacy
for the purpose of misleading Lender-3 and Lender-4 into believing that
the purported borrower, C.F., had millions in liquid assets. Defendant
**MEDLEY**, Individual-1, Farrell, and Bryant knew the bank statement was
false and fraudulent when it was ultimately submitted to Lender-3 and
Lender-4.

46. Similarly, on or about April 11, 2022, Farrell emailed Individual-1
and Bryant and requested a copy of 2 Big Legacy's March 2022 Bank of
America bank statement. On or about the same day, Bryant emailed
Individual-1 a purported copy of 2 Big Legacy's March 2022 statement
showing an ending balance of $3,070,311.92. In actuality, 2 Big Legacy's
ending balance in March 2022 was $423,934.85. On or about April 12, 2022,
Individual-1 forwarded the fraudulent bank statement from Bryant to
Farrell.

47. During the lending process, Farrell electronically submitted and
caused to be electronically submitted to Lender-5 the false and fraudulent
March 2022 Bank of America bank statement for 2 Big Legacy for the

13

purpose of misleading Lender-5 into believing that the purported borrower, C.F., had millions in liquid assets. Defendant **MEDLEY**, Individual-1, Farrell, and Bryant knew the bank statement was false and fraudulent when it was submitted to Lender-5.

48. As part of closing Transaction-2, which constituted a series of separate transactions involving the Brittany Place Property, defendant **MEDLEY** received closing instructions from Lender-3, Lender-4, and Lender-5, which defendant **MEDLEY** was required to follow before distributing any loan proceeds from these lenders.

49. For example, on or about May 5, 2022, Lender-5 emailed defendant **MEDLEY** a list of items to be completed, including substantiating that 2 Big Legacy had provided the required funds to close the transaction. Defendant **MEDLEY** responded that same day stating he was working on completing the required items.

50. On or about May 10, 2022, defendant **MEDLEY** forwarded Lender-5 an email defendant **MEDLEY** received from his bank, First Citizens Bank & Trust Co. ("First Citizens") that stated he had received a wire transfer for $2,465,000 from 2 Big Legacy. Defendant **MEDLEY** failed to disclose to Lender-5 that 2 Big Legacy did not actually provide these funds, but rather defendant **MEDLEY** was the source of the funds. Defendant **MEDLEY** failed to disclose that he wired funds from an account he controlled to 2

14

Big Legacy, which 2 Big Legacy in return wired back to defendant **MEDLEY**.

51. Specifically, on or about May 9, 2022, defendant **MEDLEY** wired $2,464,131.03 from one of his IOLTA accounts to 2 Big Legacy's Bank of America account. On or about May 10, 2022, 2 Big Legacy wired $2,465,000 to defendant **MEDLEY's** First Citizens account. As a result of these two wire transfers, defendant **MEDLEY** falsely made it appear to Lender-5 that 2 Big Legacy provided the required funds to close the transaction.

52. Lender-3, Lender-4, and Lender-5's closing instructions also required defendant **MEDLEY** to provide a certified copy of the settlement statement disclosing how the loan proceeds were disbursed at the closings. Defendant **MEDLEY** prepared false and fraudulent settlement statements indicating, among other things, that the loan proceeds had been distributed to Maple Key and the transactions (collectively Transaction-2) had closed. In actuality, as defendant **MEDLEY** knew, Maple Key did not receive the loan proceeds to close on the sale of the properties. Defendant **MEDLEY** in fact failed to properly record the transactions as required by Lender-3, Lender-4, and Lender-5, despite representing to the contrary that he in fact had done so. Defendant **MEDLEY**, Individual-1, and others also failed to disclose to Lender-3, Lender-4, and Lender-5 the existence of a purported agreement between 2 Big Legacy and Maple Key under which

15

Maple Key supposedly agreed to allow 2 Big Legacy to use the proceeds from the closings. Lender-3, Lender-4, and Lender-5 would never have approved the loans had they known that 2 Big Legacy had not used the proceeds to close any of the transactions with Maple Key.

53. In or about February 2022, Lender-3 disbursed over $2 million in loan proceeds to via electronic wire transfers to defendant **MEDLEY's** account. Between in or about February 2022 until in or about March 2022, Lender-4 caused electronic wire transfers totaling over $6.4 million to be transmitted to defendant **MEDLEY's** account.  In May 2022, Lender-5 caused electronic wire transfers totaling over $5 million to be transmitted to defendant **MEDLEY's** account.

### Brittany Place – Transaction-3

54. Beginning on a date unknown but no later than in or about June 2022, Individual-1 directed Farrell to work with brokers to identify potential lenders to finance Transaction-3.

55. Farrell corresponded with other brokers in her network to obtain financing for Individual-1 to purchase multiple buildings within the Brittany Place Property through BP 2022. Through Farrell's network, she identified Lender-6 as a potential source of financing.

56. As part of the lending process, Lender-6 required bank statements from the borrower, C.S., and the C.S.'s company, Spry Holdings. For

example, on or about July 12, 2022, Farrell emailed Spry Holdings's actual bank statements to Individual-1 and Bryant. The bank statements were for April, May, and June 2022 for Spry Holdings's Capital One bank account showing ending balances of $65,435.24, $56,236.24, and $53,828.73, respectively. In the email, Farrell asked Individual-1 and Bryant to "update" the bank statements.

57. Bryant worked with Individual-2 to create false and fraudulent April, May, and June 2022 Capital One bank statements for Spry Holdings. On or about July 12, 2022, Individual-2 emailed Bryant fraudulent bank statements for April, May, and June 2022 for Spry Holdings's Capital One account showing ending balances of $5,065,435.24, $5,056,236.24, and $5,053,828.73, respectively. On or about July 13, 2022, Bryant emailed the three fake bank statements created by Individual-2 to Individual-1 and Farrell.

58. During the lending process, Farrell electronically submitted and caused to be electronically submitted to Lender-6 the false and fraudulent May and June 2022 Capital One bank statements for Spry Holdings for the purpose of misleading Lender-6 into believing that the purported borrower, Spry Holdings, had millions in liquid assets. Defendant **MEDLEY**, Individual-1, Farrell, and Bryant knew the bank statements

17

were false and fraudulent when they were ultimately submitted to Lender-6.

59. In preparation for the closing of Transaction-3, and prior to defendant **MEDLEY** releasing any loan proceeds received from Lender-6, defendant **MEDLEY** was required to follow Lender-6's closing instructions. Lender-6's closing instructions required defendant **MEDLEY** to provide a certified copy of the settlement statements disclosing how the loan proceeds were disbursed at Transaction-3's closing.

60. On or about July 25, 2022, Lender-6 caused an electronic wire transfer totaling over $8 million to be transmitted to defendant **MEDLEY's** account. Lender-6 would not have disbursed the loan proceeds to defendant **MEDLEY** if it knew the certified settlements contained false information.

61. Shortly after wiring the funds to defendant **MEDLEY**, Lender-6 learned there were potential improprieties with Transaction-3, and on or about July 28, 2022, Lender-6 informed Farrell that the loan proceeds needed to be returned. On or about August 1, 2022, defendant **MEDLEY** wired the entire loan proceeds back to Lender-6.

### Overt Acts

62. To carry out the conspiracy and effect the objects and purposes thereof, the defendant, **LEONARD MEDLEY**, and known and unknown

18

members of the conspiracy, committed various overt acts, among others, in the Northern District of Georgia and elsewhere:

    a.  On or about February 3, 2022, Farrell emailed to Individual-1 and Bryant, the actual December 2021 statement for C.F.'s Chase x3536 business account, showing an ending balance of $623.25.

    b.  On or about February 4, 2022, Bryant emailed Individual-1 and Farrell, a fraudulent December 2021 statement for C.F.'s Chase x3536 business account, showing an ending balance was $6,000,623.25.

    c.  On or about February 9, 2022, Bryant emailed Individual-1 and Farrell, a fraudulent January 2022 statement for C.F.'s Chase x3536 business account, showing an ending balance was $6,002,595.14.

    d.  On or about March 2, 2022, Farrell requested from Individual-1 and Bryant, February 2022 bank statements for 2 Big Legacy and 2 Big Holdings.

    e.  On or about March 3, 2022, Bryant emailed Individual-1 and Farrell fraudulent December 2021, January 2022, and February 2022 statements for 2 Big Holdings' BOA x5037 account, each of which showed ending balances over $6.8 million.

f.  On or about April 12, 2022, Individual-1 forwarded to Farrell a fraudulent March 2022 bank statement for 2 Big Legacy's BOA x4804 account.

g.  On or about April 21, 2022, Individual-1 forwarded to Farrell a fraudulent March 2022 bank statement for 2 Big Holdings' BOA x5037 account.

h.  On or about April 21, 2022, Bryant emailed Individual-2 the actual December 2021 statement for C.F.'s Chase x3536 business account, showing an ending balance of $623.25 and requested Individual-2 make a fraudulent March 2022 bank statement for the Chase x3536 account.

i.  On or about April 21, 2022, Bryant sent $200 to Individual-2 via Western Union and emailed Individual-2 a copy of the receipt.

j.  On or about April 21, 2022, Individual-2 emailed Bryant a fraudulent March 2022 statement for C.F.'s Chase x3536 business account, showing an ending balance was $8,001,610.14.

k.  On or about May 3, 2022, Farrell emailed Individual-1 and Bryant requesting an April 2022 statement for 2 Big Legacy.

l.  On or about May 4, 2022, Bryant emailed Individual-2 the fraudulent March 2022 statement for C.F.'s Chase x3536 business account that Individual-2 had fabricated as a template to create a fraudulent April 2022 statement for the Chase x3536 account.

m. On or about May 4, 2022, Individual-2 emailed Bryant a fraudulent April 2022 statement for C.F.'s Chase x3536 account, showing an ending balance was $8,005,701.98.

n.  On or about May 4, 2022, Bryant sent $200 to Individual-2 via Western Union and emailed Individual-2 a copy of the receipt.

o.  On or about May 9, 2022, defendant **MEDLEY** wired $2,464,131.03 from one of his IOLTA accounts to 2 Big Legacy's Bank of America account.

p.  On or about May 10, 2022, defendant **MEDLEY** forwarded Lender-5 an email defendant **MEDLEY** received from his bank, First Citizens, that stated he had received a wire transfer for $2,465,000 from 2 Big Legacy.

q.  On or about June 5, 2022, Farrell emailed the fraudulent April and May 2022 statements for C.F.'s Chase x3536 business account to other brokers who forwarded Farrell's original email with the fraudulent statements to Lender-1.

r.  On or about June 9, 2022, defendant **MEDLEY** wired $118,955
to Farrell in connection with Transaction-1.

s.  On or about June 9, 2022, defendant **MEDLEY** wrote a check
for $170,000 to JP & Associates Realtors, as the listing agent for
the MLK Property.  On or about June 15, 2022, JP & Associates
Realtors wrote a check for $135,250 to Bryant reflecting her
commission on the sale of the MLK Property.

t.  On or about July 1, 2022, defendant **MEDLEY** wired
$10,324,876.79 million to Lender-2.

All in violation of Title 18, United States Code, Section 371.

### Forfeiture

63. Upon conviction of the offense alleged in Count One of this
Information, the defendant, **LEONARD MEDLEY**, shall forfeit to the
United States of America, pursuant to Title 18, United States Code, Section
981(a)(1)(C) and Title 28, United States Code, Section 2461, any property,
real or personal, which constitutes or is derived from proceeds traceable to
such offense. The property to be forfeited includes, but is not limited to,
the following:

MONEY JUDGMENT: A sum of money in United States
currency, representing the amount of proceeds obtained

as a result of the offense alleged in Count One of this

Information.

64. If any of the property described above, as a result of any act or

omission of the defendant:

     a.  cannot be located upon the exercise of due diligence;

     b.  has been transferred or sold to, or deposited with, a third party;

     c.  has been placed beyond the jurisdiction of the Court;

     d.  has been substantially diminished in value; or

     e.  has been commingled with other property which cannot be
        divided without difficulty;

the United States of America intends, pursuant to Title 21, United States

Code, Section 853(p), as incorporated by Title 28, United States Code,

Section 2461(c), to seek forfeiture of any other property of said defendant

up to the value of the forfeitable property.

THEODORE S. HERTZBERG
*United States Attorney*

ALEX R. SISTLA
*Assistant United States Attorney*
Georgia Bar No. 845602

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181